IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez

Civil Action No. 16-cv-2532-WJM

RICHARD M. CHAVEZ,

    Plaintiff,

v.

CAROLYN W. COLVIN, Acting Commissioner of Social Security,

    Defendant.

**ORDER REVERSING ADMINISTRATIVE LAW JUDGE'S DECISION AND REMANDING TO THE COMMISSIONER**

This is a social security benefits appeal brought under 42 U.S.C. § 405(g). Plaintiff Richard Chavez ("Plaintiff") challenges the final decision of Defendant, the Acting Commissioner of Social Security ("Commissioner") denying her application for supplemental social security income benefits. The denial was affirmed by an Administrative Law Judge ("ALJ"), who found that while he does have severe impairments, Plaintiff has the residual functional capacity ("RFC") to perform a full range of work at all exertional levels, but with several nonexertional limits. The Appeals Council denied the Request for Review, and this appeal followed.

For the reasons set forth below, the ALJ's denial of benefits is reversed and the case is remanded to the Commissioner for rehearing.

## I. BACKGROUND

**A. Factual and Medical Background**

Plaintiff Richard Chavez was age 46 at the time he filed his application for

benefits. (ECF No. 14 at 2.) He is the father of two daughters and lives with his aunt and uncle. (Admin. Record ("R.") (ECF No. 11) at 510.) He has a high school education and was employed as a warehouse worker and fabrication helper. (ECF No. 16 at 3.) However, Plaintiff stopped working in May 2010, because, according to him, "work was slow." (*Id.*) Plaintiff has a history of alcohol abuse. (*Id.*) In March 2012, Plaintiff was in the hospital due to intoxication. (*Id.*) Medical providers administered brain imaging which revealed a 5.5 cm (2.17 inch) mass in the left side of Plaintiff's brain. (ECF No. 16 at 3.) The mass was identified as a meningioma, "a type of tumor that is often benign and arises from the brain coverings and spinal cord." (*Id*.) It was surgically removed and a metal plate was placed in his skull at the site of the surgery. (R. at 73.) After the surgery, Plaintiff developed a seizure disorder—which he treats with medication—and neurocognitive impairment. (ECF No. 16 at 4; ECF No. 14 at 2.) Plaintiff claims that he "became unable to work in March 2012 due to the seizures, kidney problems, memory loss, a brain mass, and left eye problems" (ECF No. 16 at 3) and is alleging disability since March 23, 2012 (R. at 20).

In September 2012, the nonexamining State agency physicians, Dr. James J. Wanstrath, Ph.D. and Dr. Jeffrey Wheeler, M.D. found that Plaintiff was not disabled, but has mild difficulties in maintaining concentration, persistence, or pace. (R. at 70, 75.) They explain that Plaintiff can pay attention for an hour, can follow written and spoken instructions—although, he is "a lot better" at following spoken instructions. (R. at 70.) They found that Plaintiff was okay with authority figures and dealing with others. (*Id.*) Their overall assessment was that Plaintiff's mental impairments were "not severe." (*Id.*) However, they did note that he has exertional limitations and that this is a

"protective limitation in case of seizure." (R. at 73.) They also note that Plaintiff "needs to avoid the very heaviest of lifting" because such exertion "would increase intracranial pressure." (*Id.*) In their RFC, the nonexamining state agency physicians found that Plaintiff demonstrates a "medium" maximum sustained work capability. (R. at 74.) They specifically listed Polisher and Buffer II (any industry), General Laborer (plastic products), and Crate Liner (furniture) as three occupations that exist in the national economy that Plaintiff is capable of. (*Id.*)

In November 2012, one of Plaintiff's treating providers, Amy Quarre, PA-C, responded to a request from the Colorado Department of Human Services–Disability Determination Services in regard to Plaintiff. (R. at 424.) Her report indicated that she had "seen and evaluated Mr. Chavez on 3 occasions and find him to be physically and mentally disabled due to a brain neoplasm and seizure disorder." (*Id.*) She explains that since having brain surgery, Plaintiff "has struggled with short-term memory loss, headaches, and uncontrolled seizures." (*Id.*) She also noted that she "suspect[s] it would take at least 12 months" for patient's health status to improve. (*Id.*)

In September 2014, Plaintiff's other treating provider, Darryl Lacy, PA, found that Plaintiff "is not totally disabled but does have a physical or mental impairment that substantially precludes this person from engaging in his/her usual occupation." (R. at 453.) Lacy also indicated on the form that this condition "has been or will be" present for a period of 7 months, and that physical exertion is limited to "moderate" activity. (*Id.*) Moreover, Lacy indicated on the form that he found Plaintiff "has been or will be totally and permanently disabled to the extent they are unable to work full time at any job due

3

to a physical or mental impairment.[1]  This disability is expected to last 12 months or more." (*Id.* at 454.)

The Plaintiff appeared and testified at a hearing held on October 27, 2014, before Administrative Law Judge Richard Maddigan.  (R. at 20.)  After the hearing, ALJ Maddigan ordered consultative examinations.  (*Id.*)

The consultative physical exam was performed by Dr. Timothy Moser, M.D. on November 15, 2014.  (R. at 496.)  Dr. Moser found Plaintiff to be a "well-nourished, well-hydrated, and well-developed male in no apparent distress." (R. at 497.)  Dr. Moser reported that Plaintiff was "alert and oriented." (*Id.*)  Dr. Moser based his conclusions on the fact that Plaintiff was able to sit comfortably throughout the history portion of the examination, was able to get on and off the examination table without difficulty, was able to take his shoes off and put them back on at the end of the examination, and was able to hear normal conversation without difficulty.  (*Id.*)  Additionally, Dr. Moser reported that Plaintiff had "no restrictions for standing and walking" or sitting.  (R. at 499.)  He found that Plaintiff had "no restrictions for lift and carry" and limitations on postural activity or manipulative activity.  (*Id.*)  He found that Plaintiff did not need assistive medical devices.  (*Id.*)  Finally, Dr. Moser noted, that "[w]orkplace environmental activity limitations would include no working at heights or around heavy machinery secondary to the presence of seizure disorder." (*Id.*)

In December 2014, Dr. David Benson, Ph.D. performed plaintiff's consultative mental health exam.  Dr. Benson found that Plaintiff's ability to understand, remember,

---

[1]Lacy indicated that he was referring specifically to Plaintiff's head trauma and seizure disorder.

4

and carry out instructions is indeed affected by his impairment. (R. at 507.)

Specifically, Dr. Benson identified the following restrictions:

1. Moderate impairment in Plaintiff's ability to understand and remember simple instructions;

2. Moderate impairment in Plaintiff's ability to carry out simple instructions;

3. Mild impairment in Plaintiff's ability to make judgments on simple work-related decisions;

4. Marked impairment in Plaintiff's ability to understand and remember complex instructions;

5. Marked impairment in Plaintiff's ability to carry out complex instructions; and

6. Marked impairment in Plaintiff's ability to make judgments on complex work-related decisions.

(R. at 507.) Moreover, Dr. Benson found that Plaintiff's ability to interact appropriately with supervision, coworkers, and the public, as well as to respond to changes in routine work setting is affected by his impairment. (R. at 508.) Specifically, Dr. Benson identified moderate impairment in Plaintiff's ability to interact appropriately with the public, Plaintiff's ability to interact appropriately with his supervisor(s), Plaintiff's ability to interact appropriately with co-workers, and a marked impairment in Plaintiff's ability to respond appropriately to usual work situations and to changes in a routine work setting. (*Id.*) Dr. Benson also noted that Plaintiff "has had a lifelong struggle with alcoholism which is likely to be a major impairment in the future." (*Id.*)

**B.     Agency Findings**

ALJ Maddigan retired after ordering the consultative exams and a supplemental hearing was held before Administrative Law Judge William Musseman ("the ALJ") on

5

April 30, 2015 in Pueblo, CO. (R at 21.) On December 12, 2016, the ALJ issued a written decision in accordance with the Commissioner's five-step sequential evaluation process. (R. at 22.) At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity "since April 23,2012, the application date." (*Id.*)

At step two, the ALJ found that the Plaintiff has the following "severe impairments: (1) Seizure disorder; and (2) Brain mass, status post craniotomy, with residual neurocognitive impairment." (*Id.*) The ALJ stated, "these impairments impose more than minimal restriction on the claimant's ability to perform basic work activities and therefore are 'severe' impairments within the meaning of the Regulations." (*Id.*) The ALJ also found Plaintiff's alcohol abuse disorder to be "not a severe impairment," given that Plaintiff has alleged that he no longer drinks and the evidence supports this claim. (R. at 23.)

At step three, the ALJ found that Plaintiff "does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926)." (*Id.*) The ALJ pointed out that the Plaintiff has no restriction in activities of daily living. (*Id.*) The ALJ also stated, "in social functioning, the [Plaintiff] has no restriction." (*Id.*) According, to the ALJ, "[t]here is no persuasive evidence of significant limitation in this area of functioning due to a mental impairment." (*Id.*) The ALJ did acknowledge, however, that "[w]ith regard to concentration, persistence or pace, the claimant had moderate difficulties." (*Id.*) He points out that mental status exams have revealed impaired delayed recall, impaired digits span and depressed

mood. (*Id.*) However, the ALJ further states that "mental status exams have also revealed many instances of no abnormalities, and an ability to recall five out of five items on immediate recall." (*Id.*)

Before proceeding to step four, the ALJ assessed Plaintiff's RFC. The ALJ concluded that Plaintiff has the RFC to perform "a full range of work at all exertional levels but with the following nonexertional limitations: [Plaintiff] cannot perform complex tasks . . . and cannot work at hazardous work areas, unprotected heights, or around dangerous machinery." (R. at 24.) The ALJ explained that "[a]lthough [Plaintiff] has described daily activities that are fairly limited," these limitations "cannot be objectively verified with any degree of certainty," and "it is difficult to attribute that degree of limitation to [Plaintiff's] medical condition as opposed to other reasons., in view of the relatively weak medical evidence." (R. at 26.) Indeed, the ALJ assigned "little weight" to the opinions of Quarre and Lacy—Plaintiff's treating providers—because they are physician assistants rather than doctors. (R. 26-27.) The ALJ assigns little weight to the consultative psychological examiner Dr. Benson, because the opinion was given after a single examination, was not explained in persuasive detail, and "is significantly inconsistent with the normal mental status exam findings found by most of [Plaintiff's] treating providers." (R. at 27.)

The ALJ also gave little weight to the opinions of state agency Drs. Wanstrath and Wheeler. (*Id.*) While Dr. Wanstrath found that Plaintiff did not have a severe mental impairment, his opinion was inconsistent with the record, which indicates that Plaintiff does have "some neurocognitive impairment." (*Id.*) On the other hand, Dr. Wheeler's "opinion includes exertional limitations that are neither explained in

7

persuasive detail nor consistent with [Plaintiff's] exam findings and treatment history." (*Id.*) In reaching his RFC conclusion, the ALJ relied on "the objective diagnostic evidence, [Plaintiff's] exam findings and treatment history, and the record as a whole." (R. at 28.) The ALJ assigned great weight to the consultative examiner Dr. Moser's opinion that Plaintiff should not work at heights or around dangerous machinery, but had no other limitations. (R. at 27.)

In step four of the sequential evaluation process, the ALJ found that Plaintiff "is unable to perform any past relevant work." (*Id.*) Thus, the ALJ proceeded to step five where he found, "considering claimant's age, education, work experience, and residual function capacity, there are jobs that exist in significant numbers in the national economy that [Plaintiff] can perform." (*Id.*)

Accordingly, the ALJ found that Plaintiff is not disabled under section 1614(a)(3)(A) of the Social Security Act. (R. at 29.) The ALJ's decision is the Commissioner's final decision because the Appeals Council denied review. (ECF No. 14 at iii.) Plaintiff filed this action seeking review of the ALJ's May 18, 2015 decision.

## II. STANDARD OF REVIEW

The Court reviews the Commissioner's decision to determine whether substantial evidence in the record as a whole supports the factual findings and whether the correct legal standards were applied. *Wall v. Astrue*, 561 F.3d 1048, 1052 (10th Cir. 2009). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Id*. "It requires more than a scintilla, but less than a preponderance." *Lax*, 489 F.3d at 1084. Evidence is not substantial if it is

8

overwhelmed by other evidence in the record.  *Grogan v. Barnhart*, 399 F.3d 1257, 1261–62 (10th Cir. 2005).  In reviewing the Commissioner's decision, the Court may neither reweigh the evidence nor substitute its judgment for that of the agency.  *Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006).  "On the other hand, if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  *Thompson v. Sullivan*, 987 F.2d 1482, 1487 (10th Cir. 1993).

### III. ANALYSIS

On appeal, Plaintiff makes two arguments as to why the ALJ's decision should be reversed: (1) the ALJ did not have valid reasons for rejecting Dr. Benson's opinion on mental health impairments and (2) the ALJ's mental health finding is not supported by substantial evidence.  (ECF No. 14 at iv.)  The Court construes both arguments as an evidentiary challenge to the ALJ's RFC finding and will respond to both arguments simultaneously.

The Court notes that the ALJ assigned "little weight" to the opinions of the treating providers, the consultative psychological examiner, the state agency psychologist, and the state agency physician in making his RFC finding.  The Tenth Circuit has indicated that giving "little weight" to a doctor's opinions effectively rejects those opinions.  *Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012).  Here, in making his RFC findings, the ALJ relied on his own review of various treatment records to discount the opinions of five different health professionals (R. at 28), despite the rule that "an examining medical-source opinion is, *as such*, given particular consideration: it is presumptively entitled to more weight than a doctor's opinion derived from a review of

9

the medical record." *Chapo*, 682 F.3d at 1291. By extension, the health professionals' opinions were presumptively entitled to more weight than the *ALJ*'s review of the written medical record. *Cf. McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (a treating physician's medical opinion may be rejected "only on the basis of contradictory medical evidence and not due to [the ALJ's] own credibility judgments, speculation, or lay opinion"). The Court is concerned that the ALJ, as a non-medical expert, made a medical determination without relying on *any* mental health expert opinions. The Tenth Circuit has held that "[i]n choosing to reject the treating physician's assessment, an ALJ *may not make speculative inferences* from medical reports." *Robinson v. Barnhart*, 366 F.3d 1078, 1082 (10th Cir. 2004) (emphasis added). Courts in this Circuit have also found that an ALJ errs when, as in the present case, he substitute[s] his [own] medical judgment for that of five acceptable medical sources." *Cook v. Colvin*, 2016 WL 1312520, at *6 (D. Kan. Apr. 4, 2016). "An ALJ cannot substitute [his] lay opinion for that of a medical professional." *Lax v. Astrue*, 489 F.3d 1080, 1089 (2007).

Accordingly, the Court concludes that because the ALJ assigned "little weight" to the opinions of all of the health professionals who treated, examined, or reviewed the medical records of the Plaintiff, his RFC finding lacks an appropriate evidentiary basis, and that this error requires remand for a new hearing.

The Court does not intend by this opinion to suggest the results that should be reached on remand; rather, the Court encourages the parties and the ALJ to fully consider the evidence and all issues raised anew on remand. *See Kepler v. Chater*, 68 F.3d 387, 391–92 (10th Cir. 1995) ("We do not dictate any result [by remanding the

case]. Our remand simply assures that the correct legal standards are invoked in reaching a decision based on the facts of the case." (internal quotation marks omitted)).

## IV. CONCLUSION

For the reasons set forth above, the Commissioner's decision is VACATED and this case is REMANDED to the Commissioner for rehearing.

Dated this 20th day of December, 2017.

BY THE COURT:

William J. Martínez
United States District Judge